## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARY C. JUSTUS,** | ) | |
| Plaintiff, | ) | Case No. 2:07cv00065 |
| | ) | |
| v. | ) | **<u>MEMORANDUM OPINION</u>** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Mary C. Justus, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Justus's claim for supplemental security income, ("SSI"), and disabled widow's benefits, ("DWIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 402(e), 423(d) and 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

Case 2:07-cv-00065-PMS   Document 13   Filed 07/18/08   Page 1 of 27   Pageid#: 47

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Justus protectively filed her applications for SSI and DWIB on or about January 27, 2006, alleging disability as of May 1, 2000, due to anxiety attacks, depression, high blood pressure and skin cancer. (Record, ("R."), at 49-54, 75, 87-88, 265-67.) The claims were denied initially and upon reconsideration. (R. at 37-46, 269-73, 275-77.) Justus then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48.) The ALJ held a hearing on December 21, 2006, at which Justus was represented by counsel. (R. at 279-305.)

By decision dated February 23, 2007, the ALJ denied Justus's claims. (R. at 16-25.) The ALJ found that Justus met the nondisability requirements for DWIB through May 31, 2005.[1] (R. at 19.) The ALJ also found that Justus had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ determined that the medical evidence established that Justus suffered from a severe impairment, namely dysthymic disorder; however, the ALJ found that Justus

---

[1] To qualify for DWIB, an individual must show that she is the widow of a deceased wage earner, has attained age 50, is unmarried (with certain exceptions) and is under a disability which began no later than seven years after the wage earner's death or seven years after she was last entitled to survivor's benefits. *See* 20 C.F.R. § 404.335 (2008).

-2-

did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20.) The ALJ found that Justus had the residual functional capacity to perform medium work,[2] subject to a moderate reduction in concentration, which would limit Justus to simple, noncomplex tasks and little or no contact with the public. (R. at 21.) Thus, the ALJ found that Justus was unable to perform any of her past relevant work. (R. at 24.) Based on Justus's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers in the national economy that Justus could perform, including those of a cleaner and a hand packer. (R. at 24-25.) Therefore, the ALJ concluded that Justus was not disabled under the Act and that she was not eligible for benefits. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Justus pursued her administrative appeals, (R. at 12), but the Appeals Council denied her request for review. (R. at 6-8.) Justus then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). This case is currently before the court on Justus's motion for summary judgment, which was filed April 18, 2008, and the Commissioner's motion for summary judgment, which was filed May 21, 2008.

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

Case 2:07-cv-00065-PMS    Document 13    Filed 07/18/08    Page 3 of 27    Pageid#: 49

## II. Facts

Justus was born in 1950, (R. at 49-50), which, at the time of the ALJ's decision classified her as a "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e) (2008). Justus has a high school education, (R. at 80), and past relevant work as a secretary and limited work as a substitute teacher. (R. at 69-70, 288.)

At the hearing before the ALJ on December 21, 2006, the ALJ allowed the record to remain open for two weeks subsequent to the hearing so that Justus's counsel could submit relevant psychiatric records from Dr. Nasreen Dar, M.D., and additional medical records from Dr. Haresh J. Patel, M.D. (R. at 282-83.) Justus testified that she had been a widow since 1998. (R. at 285.) Justus indicated that she did not socialize, noting that she "[did] better [at] home alone." (R. at 286.) The ALJ asked, "[s]o you're kind of being a hermit[,]" to which Justus responded affirmatively. (R. at 286-87.) Justus testified that she had been a hermit since her husband's death. (R. at 287.) She further explained that, since her husband's death, she had lived on money that had been saved, as well as life insurance proceeds. (R. at 287.)

Justus testified that she had worked as a substitute teacher periodically between 1998 and 2000, but was forced to quit because she could not handle being around people. (R. at 288.) Justus testified that she merely followed the teacher's instructions and was not required to complete lesson plans. (R. at 303.) She explained that she did not substitute a great deal, noting that she only began substituting in an attempt to help her deal with the loss of her husband. (R. at 288-89.) Justus further explained that toward the end of her husband's life, he developed a drug addiction and became

-4-

verbally abusive. (R. at 289-90.) She indicated that her husband threatened to kill her, but she kept the problem hidden from people, especially her children. (R. at 290.) Justus stated that she had not remarried because her experience with her deceased husband had caused her to be unable to have another relationship with a man. (R. at 290.) She testified that she did not seek psychiatric care immediately following her husband's death because she did not want people to know that she had a problem or think that she was crazy, so she "stayed to [her]self." (R. at 290-91.) She stated that she first sought help from a family doctor when she was treated for chest pains and high blood pressure. (R. at 291.) Justus testified that the symptoms were attributed to stress and depression. (R. at 292.) She stated that she was prescribed medication and that psychiatric counseling was recommended. (R. at 292.) However, Justus noted that she did not follow the advice because she thought she could deal with the problems on her own. (R. at 292.)

Justus testified that she first sought mental health treatment in either 2005 or 2006. (R. at 292.) She referenced an emergency room visit in which she was treated for blood pressure problems and stress. (R. at 292-93.) She further explained that Dr. Patel warned her that if she did not seek help "it [would] catch up with [her] and . . . kill [her]." (R. at 293.) Justus stated that Dr. Patel referred her to Dr. Dar for psychiatric treatment. (R. at 293.) Justus also stated that Dr. Dar prescribed antidepressants, sleeping medication and nerve medication, including Xanax, Ambien and Wellbutrin. (R. at 293-94.) She noted that she had been taking the medications for three years or longer. (R. at 294.) Justus testified that the medication did "[n]ot really" help her, explaining that she could not handle or deal with people. (R. at 294.) She also testified that Dr. Dar had not recommended that she seek grief therapy or

-5-

attend a women's group for additional counseling. (R. at 294.) Justus stated that she sought treatment from Dr. Dar about one time per month. (R. at 295.) Justus testified that despite being encouraged to exercise and become involved in activities, she "would rather be at home." (R. at 295.) She explained that she had attempted these activities, but that they did not work for her. (R. at 295-96.) Justus further explained that she could not remove the images or thoughts relating to her husband from her head. (R. at 296-97.) The ALJ asked Justus if she would "be better off [going] out and [finding] some kind of job [to keep her] busy and [keep] her mind off [her] problems?" (R. at 297.) Justus stated that "when you've been put down the way that I've been put down, you don't even want to see people . . . ." (R. at 297.) Justus testified that staying at home prevented people from judging her. (R. at 297.)

Upon questioning from counsel, Justus stated that the treatment from Dr. Dar "might be" helping, but opined that the treatment was not helping "a lot because [she could not] sleep." (R. at 298.) She indicated that, on some nights, she might sleep three to four hours, but that she would wake up every one or two hours. (R. at 298.) Justus testified that she experienced nightmares about her past experiences with her deceased husband. (R. at 298.) She stated that she heard his voice at all times, in her dreams and constantly in her head. (R. at 298.) Justus noted that she heard negative things, such as namecalling and death threats. (R. at 299.) She recalled a time before he passed away in which he "put on a black jogging suit and [] hid behind [the] couch with guns and [told her] to get in the bedroom and not come out, not even to use the bathroom" or he would kill her. (R. at 299.) Justus stated that she never recovered from the abuse. (R. at 299.)

-6-

Victor Baranaskas, a vocational expert, also was present and testified at the hearing. (R. at 300-04.) Baranaskas identified Justus's past relevant work as a secretary as skilled, sedentary work.[3] (R. at 301.) He testified that Justus's transferable skills from the secretarial position would be office related, including clerical work, processing mail, invoices, setting up appointments, typing and using data entry and statistical reports. (R. at 301.) Thus, he opined that those skills would transfer to other sedentary office jobs, such as an order clerk and an information clerk. (R. at 301.) Baranaskas testified that each of the jobs was sedentary and semiskilled and available in both the regional and national economies. (R. at 301.) The ALJ asked Baranaskas if those jobs would be available to an individual with a moderate reduction in concentration due to emotional problems and an inability to work directly with the public. (R. at 301.) Baranaskas opined that such an individual would probably be capable of performing each job by phone or with one-on-one contact. (R. at 301-02.) He further opined that such an individual would have no transferable skills to jobs which did not involve dealing with the public. (R. at 302.) Furthermore, he concluded that if Justus was unable to deal with the public, she would be precluded from performing her past relevant work. (R. at 302.)

Baranaskas opined that Justus did not have past relevant work as a substitute teacher because she did not perform it a sufficient amount of time, as it was "on and off" and lacking consistency. (R. at 302.) He further noted that, as a substitute teacher, there were no educational requirements; instead, she likely acted more as a teacher's

---

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).
.

-7-

aide. (R. at 302.) He pointed out that, because she performed this job in a rural setting, she probably was not classified as either, and he indicated that she would not qualify as a substitute teacher if she were working in the Roanoke area because she had no college-level classes or teaching certificate. (R. at 302-03.)

The ALJ asked Baranaskas to consider a hypothetical individual with the same age, education and work experience as Justus, who was limited to medium work, and who, due to anxiety and depression, was moderately limited in her ability to concentrate and could work in only an environment where there was little or no contact with the public. (R. at 303-04.) Based upon those limitations, Baranaskas noted that there would be jobs available within the regional and national economies in the unskilled capacity category, such as a hand packer and a cleaner, both at the medium level of exertion. (R. at 304.) He noted that these were simple jobs in a factory-type setting that required one to two steps and did not require interaction with co-workers. (R. at 304.)

In rendering her decision, the ALJ reviewed medical records from Buchanan County Rural Family Practice Center, Inc.; Buchanan General Hospital; Tri-State Clinic; Dr. Nasreen Dar, M.D.; Dr. Shirish Shahane, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Ronald D. Hall, M.D.; and Dermatopathology Consultants, P.S.C.

Justus has not challenged any of the ALJ's findings with respect to her alleged physical impairments. Thus, the facts summarized will focus on the medical records

-8-

relevant to her alleged mental impairments. Justus was treated at Buchanan County Rural Family Practice Center, Inc., ("Buchanan Family Practice"), from October 6, 2000, to December 15, 2004. (R. at 103-46.) These medical records reflect consistent complaints of depression, anxiety, fatigue, anxiety attacks and panic attacks. (R. at 103-46.) During these visits, Dr. Jackie Briggs, M.D., assessed Justus with, among other things, fatigue, obesity, anxiety, depression, panic attacks, anxiety attacks and anxiety disorder. (R. at 103-46.) Justus routinely saw Dr. Briggs during this time period in order to receive medication refills. (R. at 103-46.) Justus was regularly prescribed medications such as Xanax, Prozac, atenolol, Lortab, Tenuate, potassium and hydrochlorothiazide. (R. at 103-46.) Dr. Briggs also consistently recommended that Justus exercise and diet. (R. at 103-46.)

Justus presented to the Buchanan General Hospital, ("Buchanan General"), emergency room, ("ER"), on August 23, 2005, with complaints of recurrent chest pain and tingling and numbness around the lips that radiated to the left arm. (R. at 165-76.) Justus's past medical history revealed general anxiety disorder with panic attacks and anxiety attacks. (R. at 167-170.) It also was noted that Justus had mowed her lawn with a push mower the day prior to presenting to the ER. (R. at 169.) Upon examination, Justus's mood and affect were normal, with no other neurological or psychological problems noted. (R. at 166.)

Justus sought treatment at Tri-State Clinic from August 24, 2005, to January 12, 2006, where she was treated by Dr. Haresh J. Patel, M.D. (R. at 177-88.) On August 24, 2005, Justus presented for a follow-up regarding an emergency room visit to Buchanan General on August 23, 2005, with complaints of chest pain, pain down the

-9-

left arm and shoulder, pressure and heaviness in the chest, pain in the left side of the neck and nausea. (R. at 179.) Dr. Patel noted a past medical history that included, among other things, generalized social anxiety disorder, panic attacks and insomnia. (R. at 179.) Justus was assessed with noncardiac chest pain, xyphisteranal joint arthritis, hypertension, generalized social anxiety disorder with panic attacks and fatigue. (R. at 179.) Justus was advised to continue taking aspirin, atenolol, potassium, Xanax, Prozac and hydrochlorathiazide. (R. at 179.)

Justus sought psychiatric treatment from Dr. Nasreen R. Dar, M.D., from November 17, 2005, to January 11, 2007. (R. at 189-92, 257-64.) In an undated "Psychiatric Record" completed by Dr. Dar, Justus presented with complaints of depression, which was attributed to the loss of her husband. (R. at 263.) Justus also complained of loss of interest in life, difficulty sleeping, decreased appetite, crying spells, feelings of tiredness, difficulty dealing with stress and continuity disturbances. (R. at 263.) Dr. Dar noted a history of depression and high blood pressure and indicated that Justus had been prescribed medications such as Xanax, Effexor and Restoril. (R. at 263.) A mental status examination revealed an anxious and depressed appearance, a tense and distant behavior, a spontaneous, soft and emotional speech, an empty and depressed mood and a dysphoric and flat affect. (R. at 264.) Justus's sensory system was intact, and she exhibited no signs of derealization or illusions. (R. at 264.) Dr. Dar noted that Justus had a goal-directed thought process and that her thought content showed no preoccupations, obessions, delusions or suicidal or homicidal ideations. (R. at 264.) Justus was diagnosed with a dysthymic disorder. (R. at 264.) On November 17, 2005, Justus presented to Dr. Dar, who again diagnosed dysthymic disorder. (R. at 262.) Justus was prescribed Lexapro, was

-10-

advised to continue her Xanax as prescribed, was advised to discontinue Effexor, and her Restoril dosage was increased. (R. at 262.)

Justus returned to Tri-State Clinic on November 28, 2005, at which time Dr. Patel noted that Justus had been referred to Dr. Dar for psychiatric treatment. (R. at 178.) Dr. Patel noted that Justus complained of generalized social anxiety disorder, panic attacks, depression and crying spells. (R. at 178.) Justus claimed that she could not go into public and that she was unable to concentrate, especially in public, that she had a poor attention span and that she could not work. (R. at 178.) Following a rather unremarkable physical examination, Dr. Patel diagnosed Justus with generalized social anxiety disorder, panic attacks, depression and hypertension. (R. at 178.) Justus was prescribed atenolol, Micro K and hydrochlorathiazide and was instructed to continue taking the medication prescribed by Dr. Dar. (R. at 178.) Dr. Patel noted that Justus could not perform any gainful employment at that time. (R. at 178.)

Justus presented to Dr. Dar on December 22, 2005, for psychiatric treatment, and Dr. Dar noted that she was "[d]oing some better" but that she remained depressed and was having difficulty sleeping. (R. at 262.) Justus's Lexapro dosage was increased, and she was told to continue her Xanax and Restoril as prescribed. (R. at 262.)

On January 12, 2006, Justus presented to Tri-State Clinic with flu-like symptoms and also complained of generalized fatigue, weakness, trouble sleeping, weight loss and loss of appetite. (R. at 177.) Justus indicated that she felt stressed out, but was unable to identify a specific reason for the stress. (R. at 177.) Justus

-11-

claimed that she had lost interest in everything, experienced difficulty concentrating and making simple decisions, felt sad constantly and that nothing seemed to make her happy. (R. at 177.) She further indicated that she did not have the energy to do the things she wanted to do and that she did not want to be around people. (R. at 177.) Justus informed Dr. Patel that she had experienced feelings of not belonging, and she stated that she would be better off "gone" than dealing with her current life situation. (R. at 177.) She claimed that she sometimes forgot to eat, and Dr. Patel noted that Justus "doesn't want to be like this but she can't seem to do very much about it no matter how she is trying." (R. at 177.) Dr. Patel also noted that a recent increase to her Lexapro dosage appeared to improve her condition. (R. at 177.) Dr. Patel diagnosed generalized social anxiety disorder with panic attacks and fatigue with suspected fibromyalgia. (R. at 177.) Justus was instructed to continue her medications and was advised to contact the clinic if she experienced any suicidal thoughts. (R. at 177.) Justus denied any homicidal or suicidal thoughts at the time of the visit. (R. at 177.)

On January 24, 2006, Justus returned to Dr. Dar's office for psychiatric treatment. (R. at 261.) Dr. Dar's progress notes show that Justus was "[n]ot doing good." (R. at 261.) Justus complained of depression, headaches and smothering. (R. at 261.) Dr. Dar's treatment plan called for Justus to continue taking Xanax, but at an increased dosage, and she discontinued Lexapro. (R. at 261.) Justus also was prescribed Zoloft. (R. at 261.) Justus again presented on March 2, 2006, with complaints of continued nervousness when around crowds. (R. at 261.) However, she indicated that she was doing "fair" emotionally. (R. at 261.) Dr. Dar advised her to continue her medications as prescribed. (R. at 261.)

-12-

On March 30, 2006, Eugenie Hamilton, Ph.D, a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, ("MRFC").[4] (R. at 204-07.) Hamilton found that Justus was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to understand, remember and carry out detailed instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. 204-05.) Hamilton determined that Justus was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 204-05.) Hamilton found that Justus's allegations were only partially credible and concluded that Justus was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting

---

[4]The MRFC completed by Hamilton contains a conflict as to when the assessment was performed, either March 30, 2006, or March 31, 2006. (R. at 204-07.) For the purposes of this opinion, the court will use March 30, 2006, as the date of the assessment.

from her impairment. (R. at 206.)

Hamilton also completed a Psychiatric Review Technique form, ("PRTF"), on March 30, 2006, finding that Justus suffered from an affective disorder and an anxiety-related disorder. (R. at 208-20.) Hamilton found that Justus had a dysthymic disorder, which was diagnosed by a psychiatrist. Similarly, Hamilton determined that Justus had a general anxiety disorder and a panic disorder, which were diagnosed by a treating physician. (R. at 213.) Moreover, Hamilton found that Justus was moderately restricted in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace and that she had experienced no episodes of decompensation. (R. at 218.) Justus's mental allegations were found to be only partially credible. (R. at 220.)

On April 6, 2006, Dr. Dar reported that Justus was doing fair emotionally and that her eating and sleeping also were fair. (R. at 261.) Justus was observed to be in touch with reality and able to relate. (R. at 261.) Justus's treatment plan was unchanged. (R. at 261.) Justus presented to Dr. Dar on May 11, 2006, and complained that Restoril caused her to dream. (R. at 260.) Justus also indicated that she continued to feel tense and frustrated. (R. at 260.) Dr. Dar discontinued Justus's Restoril prescription, prescribed Ambien and advised her to continue with the Xanax and Zoloft as prescribed. (R. at 260.) On June 15, 2006, Dr. Dar noted that Justus was doing fair, but indicated that she still experienced difficulty dealing with stress. (R. at 260.) Justus was instructed to continue her medications as prescribed. (R. at 260.) Justus returned on July 13, 2006, and claimed that she was having aches and pains and that she felt frustrated. (R. at 260.)

-14-

On August 23, 2006, Howard S. Leizer, Ph.D, a state agency psychologist, completed an MRFC and noted the same findings as those of Hamilton. (R. at 227-29.) Leizer also completed a PRTF on August 23, 2006, which revealed findings identical to those in Hamilton's March 30, 2006, evaluation. (R. at 230-43.)

Justus returned to Dr. Dar on August 24, 2006, for psychiatric treatment, and Dr. Dar again noted that Justus was doing fair emotionally. (R. at 259.) The progress notes also indicate that Justus's eating and sleeping were fair. (R. at 259.) Dr. Dar reported that Justus was in touch with reality and able to relate. (R. at 259.) She was instructed to discontinue Zoloft, she was prescribed Wellbutrin and was advised to continue her remaining medications as prescribed. (R. at 259.) Justus presented to Dr. Dar on October 10, 2006, and was reportedly "some better," but continued to complain of depression. (R. at 259.) Dr. Dar increased Justus's Wellbutrin dosage, and her remaining treatment plan was unchanged. (R. at 259.) On November 7, 2006, Justus continued to report depression and difficulty dealing with stress. (R. at 259.) Justus was prescribed Vistaril and was advised to continue her other medications as prescribed. (R. at 259.) Justus saw Dr. Dar again on December 12, 2006, and complained of headaches, difficulty sleeping and difficulty dealing with stress. (R. at 258.) Dr. Dar opined that Justus appeared to be in touch with reality and able to relate. (R. at 258.) Her treatment plan was unchanged. (R. at 258.)

On December 19, 2006, Dr. Dar completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 255-56.) Dr. Dar found that Justus had a fair ability to follow work rules, use judgment, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal

-15-

appearance. (R. at 255-56.) Dr. Dar also found that Justus had a good ability to understand, remember and carry out simple job instructions, but that she had a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 255-56.) He noted that these limitations were supported by medical/clinical findings regarding Justus's difficulty concentrating and her difficulty dealing with stress. (R. at 255-56.)

On January 11, 2007, Dr. Dar noted that Justus was doing fair emotionally, but she complained that she experienced nervousness under stress. (R. at 257.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DWIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

-16-

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 23, 2007, the ALJ denied Justus's claims. (R. at 16-25.) The ALJ found that Justus met the nondisability requirements for DWIB through May 31, 2005. (R. at 19.) The ALJ also found that Justus had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ determined that the medical evidence established that Justus suffered from a severe impairment, namely dysthymic disorder; however, the ALJ found that Justus did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20.) The ALJ found that Justus had the residual functional capacity to perform medium work, subject to a moderate reduction in concentration, which would limit Justus to simple, noncomplex tasks and little or no contact with the public. (R. at 21.) Thus, the ALJ found that Justus was unable to perform any of her past relevant work. (R. at 24.) Based on Justus's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers in the national economy that Justus could perform, including

-17-

those of a cleaner and a hand packer. (R. at 24-25.) Therefore, the ALJ concluded that Justus was not disabled under the Act and that she was not eligible for benefits. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Justus argues that the ALJ's decision is not supported by substantial evidence within the record because the ALJ erred in evaluating the severity of Justus's mental impairments and how the impairments would impact her ability to work. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-10.) In support of this argument, Justus claims that the ALJ failed to accord the proper weight to the opinion of Dr. Dar, Justus's treating psychiatrist. (Plaintiff's Brief at 7-10.) Justus also contends that a without clearer explanation of the ALJ's rationale, it is impossible to determine whether substantial evidential supports the ALJ's decision. (Plaintiff's Brief at 10.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical

-18-

evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Justus first argues that the ALJ failed to properly evaluate the severity of her mental impairments and how the impairments impact her ability to work. (Plaintiff's Brief at 5-10.) Specifically, Justus asserts that the ALJ failed to accord proper weight to the opinion of Dr. Dar, Justus's treating psychiatrist. (Plaintiff's Breif at 7-10.) I disagree.

In general, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (quoting *Hunter v.*

*Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[5]  In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.

Dr. Dar, Justus's treating psychiatrist, completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on December 19, 2006.  (R. at 255-56.)  Dr. Dar determined that Justus had a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability.  (R. at 255-56.)  Dr. Dar explained that these limitations were supported by medical and clinical findings within the record regarding Justus's difficulty concentrating and her difficulty dealing with stress.  (R. at 255-56.)

However, despite these very strict and limiting findings, Dr. Dar's own progress notes appear to be inconsistent with the previously mentioned limitations.  Justus's psychiatric treatment with Dr. Dar spanned from November 17, 2005, to January 11,

---

[5]*Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

-20-

2007. (R. at 189-92, 257-64.) During multiple office visits, Dr. Dar noted that Justus was either doing better or doing fair emotionally. (R. at 257, 259, 260-262.) Additionally, Dr. Dar reported on more than one occasion that Justus was in touch with reality and able to relate. (R. at 258-59, 261.) A mental status examination showed that Justus's sensory system was intact and revealed no signs of derealization or illusions. (R. at 264.) Justus's thought process was goal-directed, and her thought content showed no preoccupations, obsessions, delusions or suicidal or homicidal ideations. (R. at 264.) The court also points out that Dr. Dar's progress notes consist mostly of Justus's subjective complaints and simply contain a single diagnosis of a dysthymic disorder,[6] which is a mood disorder not as severe as major depression. (R. at 257-64.)

Dr. Patel, another of Justus's treating physicians, treated Justus from August 24, 2005, to January 12, 2006. (R. at 177-88.) During this time period, Dr. Patel diagnosed Justus with generalized social anxiety disorder with panic attacks, depression and fatigue. (R. at 177-79.) Dr. Patel's notes indicate that Justus denied any homicidal or suicidal thoughts. (R. at 177.) Dr. Patel's treatment notes primarily consist of subjective complaints made by Justus, followed by Dr. Patel's assessments; however, the records are of devoid of any clinical testing or evaluations with regard to Justus's mental capabilities. (R. at 177-88.) Although Dr. Patel performed no mental testing, and referenced no testing by any mental health professional, he

_____

[6]Dysthymia, or a dysthymic disorder, is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 521 (27th ed. 1988).

nonetheless determined that Justus was unable to perform any gainful employment in November 2005. (R. at 178.)

The remaining relevant evidence of record does not contain any significant findings of mental impairments or limitations. Justus was routinely treated by Dr. Briggs at Buchanan Family Practice from October 6, 2000, to December 15, 2004. (R. at 103-46.) These records show that Dr. Briggs, based upon Justus's subjective complaints, diagnosed Justus with fatigue, obesity, anxiety, depression, panic attacks, anxiety attacks and anxiety disorder. (R. at 103-46.) Dr. Briggs's records do not contain any clinical testing regarding Justus's mental abilities, and the records do not reference any referrals to a mental health professional. (R. at 103-46.) Instead, the records consist mainly of visits for medication refills. (R. at 103-46.) Records from an August 23, 2005, ER visit show that Justus's mood and affect were normal, and no psychological problems were noted. (R. at 166.)

State agency psychologist Hamilton completed an MRFC on March 30, 2006, in which she determined that Justus was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to understand, remember and carry out detailed instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness

-22-

and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. 204-05.) Hamilton determined that Justus was only moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 204-05.) Hamilton found that Justus's allegations were only partially credible and concluded that Justus was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (R. at 206.)

Hamilton also completed a PRTF on March 30, 2006, finding that Justus had a dysthymic disorder, which was diagnosed by a psychiatrist. (R. at 211.) Hamilton also found that Justus had a general anxiety disorder and panic disorder, which were diagnosed by a treating physician. (R. at 213.) As such, Hamilton concluded that Justus was only moderately restricted in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace and that she had experienced no episodes of decompensation. (R. at 218.) Justus's mental allegations were found to be only partially credible. (R. at 220.) State agency psychologist Leizer completed an MRFC and PRTF on August 23, 2006, noting findings identical to those reported by Hamilton. (R. at 227-43.)

-23-

It also should be noted that Dr. Dar, Justus's treating psychiatrist, found that Justus possessed a fair ability to follow work rules, to use judgment, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal appearance and that she had a good ability to understand, remember and carry out simple job instructions. (R. at 255-56.) In addition, a review of Justus's activities of daily living indicate that, despite her depression and anxiety, she was able to complete chores such as light cleaning, laundry, preparation of light meals and grocery shopping, and she acknowledged that she was able to drive a car. (R. at 57-60.)

Based upon a thorough review of the relevant medical evidence, the undersigned is of the opinion that the ALJ's decision to accord less weight to the opinions of Justus's treating physicians is supported by substantial evidence. Regardless of the strict limitations noted by Dr. Dar and Dr. Patel, and the fact that each were treating physicians, their opinions are inconsistent with other substantial evidence, including their own treatment and progress notes, Justus's allegations of daily activities and the relevant opinions of the state agency psychologists. Moreover, the record does not contain any evidence of significant clinical testing as to Justus's mental abilities. Therefore, because the opinions of the treating physicians are inconsistent with other substantial evidence of record, the ALJ did not err by according the opinions significantly less weight.[7] See Craig, 76 F.3d at 590.

_____

[7]Justus also argues that Dr. Dar's opinion should be afforded greater weight because she is a specialist in the field of psychiatry. See 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (2008). The court recognizes this general rule; however, as explained above, Dr. Dar's opinion is inconsistent with other substantial evidence of record. Therefore, the ALJ properly afforded the opinion less weight.

-24-

Justus also argues that Dr. Dar was the only examining physician of record to offer an opinion as to her mental limitations. (Plaintiff's Brief at 9-10.) She contends that the only other opinions as to her mental limitations were offered by the state agency psychologists, whose opinions were rendered prior to the receipt of Dr. Dar's medical assessment and a portion of her treatment notes, as the records were dated subsequent to the state agency opinions. (Plaintiff's Brief at 9-10.) Nevertheless, the court is of the opinion that the treatment notes dated after the state agency opinions would not have altered the findings, as the treatment notes from that time period reflect virtually the same subjective complaints and notations as reported in the treatment notes that the state agency psychologists were able to review. The court recognizes that the strict limitations set forth in Dr. Dar's Medical Assessment Of Ability To Do Work-Related Activities (Mental) could have provided information that may have altered the state agency opinions. However, when the medical assessment is considered in conjunction with Dr. Dar's treatment notes, it is reasonable to understand why the ALJ failed to give great weight to the opinion, as it is inconsistent with the routine and unremarkable treatment notes of record. Thus, the undersigned is of the opinion that, due to the inconsistency and questionable nature of the findings, the receipt of Dr. Dar's medical assessment would not have changed the opinion of the state agency psychologists when viewed alongside Dr. Dar's treatment notes.

Next, Justus argues that because the ALJ's rationale was not clearly explained, it is impossible to ascertain whether substantial evidence supports the ALJ's decision. (Plaintiff's Brief at 10-11.) This argument is without merit. As mentioned previously, in determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and

-25-

whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979) (citations omitted).

> The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, the ALJ properly analyzed all relevant and probative evidence. (R. at 21-24.) In particular, the ALJ specifically explained the weight she accorded to the treating physicians as well as the state agency psychologists. (R. at 23-24.) In assessing the evidence, the ALJ determined that the opinions of the treating physicians were in conflict with other evidence of record. Conversely, the ALJ determined that the opinions of the state agency psychologists were supported by the evidence of record. As such, the undersigned finds that the ALJ sufficiently analyzed all relevant evidence and properly noted the weight given to that evidence.

For the above stated reasons, I find that substantial evidence does exist to support the ALJ's decision not to afford the opinions of Dr. Dar and Dr. Patel great

-26-

weight, as their opinions are inconsistent with the substantial evidence of record. In addition, I find that the ALJ properly analyzed all of the relevant evidence and sufficiently explained her findings and her rationale in crediting the evidence.

## IV. Conclusion

For the foregoing reasons, Justus's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 18th day of July 2008.


/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE